UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| RICHARD G. MIEKKA, as Personal Representative for the Estate of James R. Miekka, <br><br> Plaintiff <br><br> v. <br><br> ALLSTATE INSURANCE COMPANY, <br><br> Defendant | ) ) ) ) ) ) ) ) 1:16-cv-00236-GZS ) ) ) ) ) |

**RECOMMENDED DECISION ON MOTIONS FOR SUMMARY JUDGMENT**

In this action, Plaintiff Richard Miekka, as Personal Representative of the Estate of James Miekka, his son, seeks to recover proceeds under an automobile insurance policy issued by Defendant Allstate Insurance Company (the Policy). The matter is before the Court on the parties' motions for summary judgment.

Following a review the summary judgment filings, and after consideration of the parties' arguments, I recommend the Court grant Defendant's Motion for Summary Judgment (ECF No. 29) and deny Plaintiff's Motion for Summary Judgment (ECF No. 33).

**FACTUAL BACKGROUND**

Plaintiff Richard Miekka is the personal representative of the estate of his late son, James R. Miekka, whose estate was probated in Citrus County, Florida. (Defendant's Statement of Material Facts (DSMF), ECF No. 30, ¶ 1; Plaintiff's Statement of Material Facts (PSMF), ECF No. 34, ¶ 1.) James Miekka died as the result of an August 19, 2014, motor vehicle accident in Surry, Maine, which accident occurred when James was walking along the side of the road and was struck by a motor vehicle. (DSMF ¶ 2; PSMF ¶ 3.) The operator of the motor vehicle

maintained liability insurance coverage in the amount of $50,000, which amount was paid to James's estate. (DSMF ¶¶ 3, 4.) At the time of his death, James, who had been blind since age 27, was 54 years old. (DSMF ¶¶ 13, 14.)

The Policy was issued by Defendant to James's parents, Richard Miekka (Plaintiff) and Jeanette Miekka, who reside in St. Petersburg, Florida. (DSMF ¶ 5.) The Policy includes uninsured motorist (UM) coverage in the amount of $100,000. (*Id.* ¶ 7; Joint Stipulation ¶ 6, ECF No. 14.) To recover UM coverage under the Policy, a person must, inter alia, qualify as an "Insured person," which term is defined to include "any resident relative" of the policy holder. (DSMF ¶¶ 10 – 11.) The parties agree Plaintiff can recover under the Policy only if James qualified as a "resident relative" of his parents at the time of the motor vehicle accident.

The Policy defines "resident" or "reside" as: "the physical presence in your [the policy holders'] household with the intention to continue living there. Your unmarried dependent children while temporarily away from home will be considered resident(s) if they intend to continue to live in your household." (*Id.* ¶ 12.)

James spent time every year, including overnight stays, at three different homes: (1) his parents' home in St. Petersburg, Florida; (2) a home James owned in Homosassa, Florida; and (3) a home James owned in Surry, Maine. Plaintiff attempts to establish as an undisputed fact that James was a resident of, or resided at, his parents' home in St. Petersburg.[1] Defendant attempts to establish as an undisputed fact that James was a resident of his homes in Homosassa and Surry, and was only an occasional guest at his parents' home in St. Petersburg.[2]

---

[1] Plaintiff further asserts that James qualified as an insured under the Policy even though he resided in more than one home, because one of the homes in which he resided was his parents' home.

[2] The statements offered by a party in support of its motion for summary judgment, to the extent they are qualified or denied by the opposing party, must be considered in light of the summary judgment standard, which requires the Court to review the record in the light most favorable to the non-movant and draw reasonable inferences in favor of the non-movant.

*Record offered by Plaintiff to establish James's residence in St. Petersburg*

When the Miekkas moved to their current home in St. Petersburg, in 1993, James moved with them, and had his own bedroom. The room remained his bedroom until his death. (PSMF ¶ 6.) James owned two homes of his own; one in Citrus County, Florida, and a summer home in Maine. (*Id.* ¶ 7.)

According to James's father, James "spent his summers in a home that he owned in Maine [and] lived in Citrus County the rest of the year except when he was visiting our home." (*Id.*; July 2016 R. Miekka Deposition at 10:17 – 25.) Jeanette Miekka, James's mother, reports that James stayed at the St. Petersburg house "maybe six or seven times a year;" sometimes he would stay "just a few days" and other times "it would be a week, maybe a little longer." (Jeanette Miekka Deposition at 8:11 – 16, ECF No. 34-2.)

James had a key to his parents' house. (PSMF ¶ 8.) In his bedroom at his parents' house, James kept clothing and certain other items related to his hobbies, which items included those used for hunting. (*Id.* ¶¶ 9, 47.) James also maintained a toothbrush, toothpaste, and a razor in a bathroom in his parents' home. (*Id.* ¶ 10.) In addition, in the home, James had personal financial records, work-related documents, breakfast cereal, and some bottles of alcohol. (*Id.* ¶¶ 12, 39, 41.)

James's guide dog was familiar with the Miekka's home and had been trained to be familiar with the City of St. Petersburg. (*Id.* ¶¶ 13, 57.) James had other guide dogs in the past and they were also trained for his parents' house. (*Id.* ¶ 14.)

James had a girlfriend, Susan Tate, who lived in Citrus County, where James owned a home; they had been in the relationship for 12 years. (*Id.* ¶¶ 15, 42.) Ms. Tate did not live with James, but she lived close to James and they visited about twice each week. (*Id.* ¶ 63.)

James was self-employed as a financial advisor and wrote a monthly newsletter that he distributed to his clients.  Richard Miekka served as James's assistant in the publication of the report.  He typed the reports for James and composed parts of the reports with James's input.  The report was written and produced at Richard and Jeannette Miekka's home in St. Petersburg.  (*Id.* ¶ 16.)

James filed U.S. tax returns with Richard's assistance.  James used his parents' residence address on all tax returns.  (*Id.* ¶ 17.)  James regularly received most of his mail, including social security documents, IRS documents, bank and credit card statements, and multiple brokerage and stockholder statements, at his parents' home.  (*Id.* ¶¶ 19 – 24, 44, 46.)  James received bills at his parents' address regarding his own homes, including utility bills, television and electric bills and lawn mowing bills for the homes.  (*Id.* ¶¶ 25, 44.)

James's homeowner's policy for his Surry, Maine, property was sent to "James Miekka, care of Richard and Jeannette Miekka" at their St. Petersburg address.  (*Id.* ¶ 26.)  The Town of Surry sent the real-estate tax bill to James at his parents' home; James also received pharmacy statements at his parents' address.  (*Id.* ¶¶ 27 – 28.)  Recordings from the Pinellas County Library for the Blind, James's Florida hunting and fishing certificate, mailings from James's dentist in St. Petersburg, the death certificate from the State of Maine, and the report of the Chief Medical Examiner were also sent to the parents' home in St. Petersburg.  (*Id.* ¶¶ 29 – 32, 49.)

When James was not at his parents' home, he spoke to them almost daily by telephone, including calls related to the stock market report James prepared with his father.  (*Id.* ¶¶ 37 – 38.)  James relied on his parents and was dependent on them to pay his bills from their home for many years.  (*Id.* ¶ 45.)  James obtained semiannual dental care in St. Petersburg and also obtained some medical care there.  He also had a medical care provider in Homosassa.  (*Id.* ¶ 49.)

James told his mother, "Well, I have three homes, 'cause this is home too." When he spoke of coming to the St. Petersburg home, he would say he was "coming home." (*Id.* ¶ 50.) Jeannette Miekka considered the home in St. Petersburg to be James's home as much as it was hers and Richard's. (*Id.* ¶ 51.)

When James spoke to his girlfriend, Ms. Tate, about going to his parents' home, he would say he was going "back home." (*Id.* ¶ 54.) He also referred to the St. Petersburg home as his "city home." (*Id.* ¶ 55.)

### *Record offered by Defendant to establish James was not a resident of his parents' St. Petersburg home*

When asked about his son's decision to buy a home in Citrus County, Richard Miekka replied: "He wanted to be independent. He didn't want to be dependent on us all the time. So he just wanted somewhere he could live, at least part of the time, on his own." (DSMF ¶ 15; R. Miekka Dep. Tr. at 38.) In or about 2000, James moved out of his parents' home in St. Petersburg and purchased a mobile home in Citrus County, Florida. (DSMF ¶ 15.) In 2004, James bought and moved into a mobile home in Homosassa to be closer to Ms. Tate. (*Id.* ¶ 17.) Richard Miekka described James's home in Homosassa as James's primary residence. (*Id.* ¶ 18.)

James maintained Florida homestead protection on his home in Homosassa, which was the only home James owned in Florida. (*Id.* ¶ 19; Pl.'s Opposing Stmt. ¶ 19.) James's home in Homosassa was approximately 100 miles from his parents' residence in St. Petersburg. (*Id.* ¶ 20.) James maintained a landline telephone there. (*Id.* ¶ 21.) James was registered to vote in Citrus County and attended church there. (*Id.* ¶¶ 23 – 24.) James owned a second home in Surry, Maine, where he spent the summer months. (*Id.* ¶ 22.)

James visited his parents in St. Petersburg several times a year. (*Id.* ¶ 25.) James typically visited his parents when he was flying to and from his Maine property and on holidays such as

Thanksgiving and Christmas.  (*Id.* ¶ 26.)  Jeanette Miekka used James's bedroom in her home as an office, and it was also used as a guest room.  (*Id.* ¶ 28.)

James supported himself financially.  (*Id.* ¶ 30.)  He was the vice-president of Blind Americans, Inc., an organization in Citrus County that assists blind people.  (*Id.* ¶ 32.)  He could read Braille, but he preferred to have things read to him by Ms. Tate or his father.  (*Id.* ¶ 33.)  Most of James's mail was sent to his parents' home so that his father could read it to him over the telephone.  (*Id.* ¶ 34.)

After James's death, his estate was probated in Citrus County.  (*Id.* ¶ 29.)

### SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'"  *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy,* 782 F.3d 73, 77 (1st Cir. 2015).  If the court's review of the record reveals evidence

sufficient to support findings in favor of the non-moving party on one or more of his claims, a trial worthy controversy exists and summary judgment must be denied to the extent there are supported claims. *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 – 24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

## DISCUSSION

In his complaint, Plaintiff asserts seven claims. To prevail on any one of the claims, Plaintiff must establish that James is an insured under the Policy and thus entitled to recover UM benefits under the Policy. (Complaint, ECF No. 1-1.) In its counterclaim for declaratory judgment, Defendant asks the Court to determine James is not an insured under the Policy. (Answer and Counterclaim, ECF No. 7.)

The Court's jurisdiction is premised on the diversity of citizenship of the parties and the amount in controversy. The core issue of whether James was insured under the policy at the time of the accident presents a state law contract matter for which state law provides the rule of decision. *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 73 (1st Cir. 2006). The parties have stipulated that Florida law governs the construction and interpretation of the Policy. (Joint Stipulation ¶ 2, ECF No. 14.)

**A.   Contract construction**

The proper construction of an insurance policy presents a question of law. *Washington Nat. Ins. Corp. v. Ruderman*, 117 So.3d 943, 948 (Fla. 2013). *Cf. State Farm Fire & Cas. Co. v. Castillo*, 829 So. 2d 242, 244 (Fla. Dist. Ct. App. 2002) ("The question of whether a particular risk is covered by an insurance policy is a question of law when the facts are undisputed.").

Under Florida law, insurance contracts are construed according to their plain meaning. *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So.2d 528, 532 (Fla. 2005). If policy language is susceptible to more than one reasonable interpretation, i.e., one that provides coverage and another that limits or denies coverage, the plain language rule does not control. *Ruderman*, 117 So.3d at 949. Ambiguous language is construed against the insurer and in favor of coverage. *Taurus Holdings, Inc.*, 913 So.2d at 532. A court can so construe a policy only after a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction. *Id.*; *see also Office Depot, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 734 F. Supp. 2d 1304, 1314 (S.D. Fla. 2010) ("the rule of adverse construction … should not be used if the parties' intent can otherwise be determined from a plain reading of the policy"). In its construction of policy language, a court may not rewrite the agreement to add meaning that is not present, nor may a court reach a result that is contrary to the parties' attention. *Taurus Holdings, Inc.*, 913 So.2d at 532.

Here, the relevant policy language is the term "resident relative." The policy defines "resident" or "reside" as: "the physical presence in your [the policy holders'] household with the intention to continue living there. Your unmarried dependent children while temporarily away from home will be considered resident(s) if they intend to continue to live in your household."

Neither party argues the language is ambiguous. Indeed, the plain language of the Policy establishes that a relative is insured under the Policy if the person resides in the home of the named insured; and that temporarily absent dependent children are insureds if they intend to continue to live in the household.

B.  **Analysis of the factual record**

The issue is whether James is a resident relative of his parents' home. More particularly, on the parties' motions for summary judgment, the issue is whether a genuine issue of material fact remains in dispute as to James's status. On the coverage issue, Plaintiff must establish the claimed loss is covered by the Policy. *Wallach v. Rosenberg*, 527 So. 2d 1386, 1388 (Fla. Dist. Ct. App. 1988); *Exhibitor, Inc. v. Nationwide Mut. Fire Ins. Co.*, 494 So. 2d 288, 289 (Fla. Dist. Ct. App. 1986). "The issue of residency under an insurance policy is typically a factual matter. However, when the facts are essentially undisputed, the Court may determine whether a family member is a resident as required for coverage under the policy." *New Hampshire Indem. Co., Inc. v. Reid*, No. 3:05-cv-1280, 2007 WL 473677, at *2 (M.D. Fla. Feb. 8, 2007).

To qualify as an insured under the Policy, James must have been a resident of his parents' home at the time he was struck by the motor vehicle. Because the record clearly establishes James did not stay exclusively with his parents and was at the time of the motor vehicle accident living in his home in Surry, Maine, the question is whether at the time, James was a "dependent" adult child, who was "temporarily away" from his parents' home, and intended to continue to use his parents' home as his residence.

Plaintiff contends James was "dependent" on his parents and subjectively considered his parents' home to be one of three equally significant residences. (Plaintiff's Motion at 9, ECF No. 33.) Plaintiff specifically argues that because of his blindness, James was dependent on his parents to assist him with certain work responsibilities, manage his mail, and maintain certain personal records. According to Plaintiff, James maintained a home in Homosassa only because he could not drive, and would have been unable to be with Ms. Tate if he lived in St. Petersburg. Plaintiff

argues had James been able to drive, he would have lived primarily with his parents and commuted to Homosassa to visit with Ms. Tate. (*Id.* at 9 – 10.)

Defendant argues that Plaintiff has not established and cannot establish James was a resident of his parents' home as evidenced by the fact James was living in Maine at the time of the accident, and that when he left Maine to return to Florida, he would have returned to his primary residence in Homosassa, Florida, where he attended church, was registered to vote, and established his "homestead" under Florida tax law. (Defendant's Motion at 5.) In essence, Defendant contends James periodically visited, but did not reside in his parents' home. (*Id.* at 5 – 6.)

### 1.   Plaintiff's motion for summary judgment

The uncontroverted evidence establishes that James owned two homes, spent the majority of his time in his two homes, stayed at his parents' home several times each year for relatively short periods of time, was registered to vote in the Florida county in which he owned a home, and established his Florida home in Homosassa as his "homestead" for Florida tax purposes. Given the uncontroverted evidence, the Court cannot conclude as a matter of law that at the time of the motor vehicle accident, James was a dependent child temporarily away from his parents' home with the intent to continue to live in his parents' home. Plaintiff, therefore, is not entitled to summary judgment.

### 2.   Defendant's motion for summary judgment

Defendant contends the same uncontroverted facts that prevent the entry of summary judgment in favor of Plaintiff entitle Defendant to summary judgment. Defendant's argument has merit. The undisputed facts suggest that at the time of the motor vehicle accident, James divided time between his two residences and visited his parents on occasion. In an effort to demonstrate James was a resident relative of his parents' home, Plaintiff cites James's reliance on his parents.

The degree of James's reliance on his parents, however, is not controlling.  Whether James was a "dependent" adult child is only one of the relevant factors.  Many adult children depend on their parents for assistance in a number of ways, including financial support, employment advice, financial investment counsel, child care, and periodic, temporary shelter for a variety of reasons.  To qualify as an insured under the Policy, the adult child must be "dependent" and only "temporarily away" from his parents' home with the intent to continue to live in the home.  The fact that James received most of his mail at his parents' home might demonstrate that because of his blindness, he "depended" on his parents to review his mail, but the destination of his mail did not establish that he was temporarily away from the home and intended to continue to make the home his residence.  That is, the record reveals the mail was sent to his parents' home for his parents to review the mail for him, but not because he resided in the home.  Given that James owned and lived in two residences other than his parents' home and returned to his parents' home only for occasional visits, contrary to Plaintiff's contention, the support provided by James's parents does not demonstrate that James resided in his parents' home.  *Am. Sec. Ins. Co. v. Van Hoose*, 416 So.2d 1273, 1275 (Fla. Dist. Ct. App. 1982) (reversing finding that adult child was a resident of insured's household where her claim to residency was based on "the large amount of support received from her father," who lived across the street from the daughter's separate household).

Likewise, James's decision to maintain certain personal items at his parents' home does not demonstrate, nor create a factual issue regarding his intentions.  Given the undisputed evidence that James would only periodically visit his parents' home for relatively short periods of time, the presence of personal items in his parents' home would be insufficient for a fact finder to conclude that he was only temporarily away from the home and intended to return to live in the home.  At

best, Plaintiff relies on facts that "evidenc[e] strong bonds of kinship, rather than any present intent to reside with his parents." *Reid*, 2007 WL 473677, at *4.

In sum, the record evidence establishes the following basic facts: (a) in 2000, James moved out of his parents' St. Petersburg home and moved approximately 100 miles away from the home to Citrus County, Florida because he wanted to be independent; (b) James maintained and lived primarily in a home in Citrus County from 2000 until the motor vehicle accident; (c) James was involved in a long time relationship with a woman who lived close to his home in Citrus County; (d) James was registered to vote in Citrus County; (e) James also owned a home in Surry, Maine, where he spent the summer months; and (f) on approximately 5 or 6 occasions each year, James visited and stayed overnight in his parents' home for relatively short periods of time. Given these undisputed facts, a fact finder could not reasonably conclude that at the time of the motor vehicle accident, James was "temporarily away" from his parents' home and intended to continue to live in his parents' home. James, therefore, was not an insured under the Policy at the time of the accident. Accordingly, Defendant is entitled to summary judgment.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant Defendant's Motion for Summary Judgment (ECF No. 29) and deny Plaintiff's Motion for Summary Judgment (ECF No. 33).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

      Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

                                                  <u>/s/ John C. Nivison</u>
                                                  U.S. Magistrate Judge

Dated this 28th day of November, 2016.